In support of which decree, the Chancellor delivered the following opinion:
By the Chancellor.
This case has frequently been before the court in various shapes, and the facts upon which the principal question between the complainants and Nehemiah Rogers, the surviving executor of Archibald Gracie, as to the right of priority of payment rests, are stated in the report of the case in 6 Paige, 415, and in 18 Wendell Rep. 319. It is not necessary to recapitulate them here, as the court for the correction of errors decided that there was no specific appropriation of the French fund, for the payment of the debts of such of the creditors of the copartnership as should consent to release the two junior members of the firm; [ *319 ] the whole of that fund, as well as other funds of the estate *of Archibald Gracie, which have come to the hands of N. Rogers, as his executor, must be considered as general assets belonging to the estate, and must be accounted for and distributed in the due course of administration, according to the legal priorities of the several creditors, as they existed at the death of A. Gracie. The question to be decided on this part of the case, therefore, is, whether, after the release of the two junior members of the firm, and the death of the senior member, the personal representative of A. Gracie, the senior member, could have been sued at law, and a recovery had thereon against him upon the original joint contracts or debts of the three copartners, or whether the remedy must not be sought upon the new contract made by A. Gracie with the several creditors, at the time he consented to the arrangement for the release of his copartners, and that h'e would himself continue responsible for the debts.
This in itself is a mere technical question, as there is no doubt that in equity A. Gracie was still liable to the creditors in the same form, indepen *243 dent of his express covenant to pay the debts out of the French fund : upon that technical question, however, the important rights of the complainants, to a priority of payment before all other creditors, depends. For the doctrine of this court is, that equality among creditors is equity. And even before the Revised Statutes, if for any cause the creditor could not secure his common law preference, either by a retainer or by a suit at law against the personal representative of the deceased debtor, or upon a security of a higher class, this court would only aid him so far as necessary to give him his rateable share in the distribution of the estate in common with other creditors. The question then arises, whether these complainants, after the death of A. Gracie, could have brought an action of debt at law, or a scire facias against his personal representative, upon the original judgment recovered against him and the two junior members of the firm jointly, or whether the remedy must not h'ave been founded upon the new contract as altered by the release and the agreement for the continuing liability of the senior member of the firm. It may be proper here to remark, that upon a motion in a former stage of this suit, the judgment in favor of the complainants ap- [ *320 ] peared to have been recovered against all three of the copartners subsequent to the execution of the release. If that were in fact so, the right of action upon the judgment would of course have survived against the junior partners only at law, and no relief could have been maintained against the personal representatives of A. Gracie, the decedent, except in equity. That of course would put an end to all claim of priority on the part of the complainants. It is now alleged, however, by them, and I think they have succeeded in showing the fact to be, that they actually signed the agreement which operated as a release of the two junior partners subsequent to the recovery of the judgment, although it was dated and was executed by other creditors before that time.
It is a general principle that a release of one of two joint debtors discharges the original contract as to both, and that a covenant not to sue both, has the same effect to avoid circuity of action. A covenant not to sue oue of two joint debtors, however, unless it clearly appears from the instrument that it wras intended to discharge both, does not in fact discharge either, so that a suit may be brought at law upon the original contract against both, if it was a joint contract, and against the one to whom the covenant was not given, if the contract was joint and several. In other words, it is in such cases construed to be a covenant merely, and not a release, so that the original contract against both debtors remains unchanged at law. Halton v. Eyre, 1 C. Marshall's Rep. 603 ; Dean v. Newhall, 8 Term Rep. 168 ; Claggett v. Salmon, 5 Gill & John. Rep. 314; Gamelt v. Macon, 6 Call's Rep. 341. The cases in which the release of one joint debtor has been held te be a re. lease of the original contract as to both, have indeed generaly ariseg where *244 there was no argument by the other party for his continuing liability. And I have not been able to find any case decided in a court of law where the question has directly arisen as to the effect of such release of one debtor with the consent of his eo-obliger, under any agreement for the continuing liability of the latter, as to the original contract itself; upon principle, however, it seems to me such an arrangement, [ *121 ] *which necessarily turns what was originally a joint contract by two parties, into a separate liability of one of them, necessarily forms a new contract as a substitute for the old one, so as to give to the creditor his right of action upon this new contract, whether such new contract is express or implied. It is, in fact, what in civil law is called a novation, or the substituting a new contract between some or all of the parties in the place of the old one, which operates as an extinguishment of the old contract, and leaves the creditor to his remedy upon the new contract only. The case of Benson v. Kincaid, 3 Penn. Rep. 57 does not decide this point; as a question of mere legal right, as contradistinguished from the equity of the case, cannot well arise in the courts of Pennsylvania, where the legal and equitable jurisdictions are so blended- together, that no distinction is made between the legal and equitable rights of parties in a suit. Besides, in that case, as the deceased debtor was merely a surety for the survivor, who might, as a survivor, be proceeded against separately upon the judgment to enforce the lien of the judgment, even bis assent was not necessary to prevent the release of his surety’s property, from operating against him as survivor. The creditor having the technical right to proceed against his property alone as the surviving debtor, and he having assented to the agreement to release the property of the other, the only question which arose was upon the technical effect of the release upon the lien of the judgment on the property of the survivor. And certainly it could not have the technical effect to prevent the releasor from proceeding against the survivor, in the same manner that he could have done if the release had never been executed . In the' present case, however, if the release of the two junior partners had not been executed, and no new agreement had been made, it is clear that the executor of the senior partner could not have been sued at all in a court of law. And the complaints must either have proceeded against the survivors and their property solely in a court of law, or he must have come into this court upon an allegation of their insolvency to reach the estate of A. Gracie in the hands of his personal representative; in [ *322 ] which case, they would have no legal preference *in payment, this court would not have given them a preference here. My conclusion therefore is, that the original joint contracts of the three copartners were novated or extinguished by the release, and were turned into new contracts against A. Grade, the senior partner, solely and individually; *245 and that all the creditors who executed the release, were at his death specialty creditors under his covenant to pay the balance of their debts, which should not be satisfied by the proceeds of the assigned property. The effect of that covenant was, that A. Gracie, upon the recovery of the French fund, would pay to each creditor the whole balance due him, and not merely to pay it out of the French fund, if that should be sufficient for that purpose ; at least, I can give no other construction to that covenant, consistently with the decision of the court for the correction of errors, by which I am bound in this case—for if the intention of the parties was merely to appropriate that fund, and that alone, to the payment of the balances of all the creditors who released the junior partners, and not to stipulate with each for the sufficiency of that fund, it was a specific appropriation, which would have given to each a pro rata distribution, according to the settled principles of equity.
The question whether the English creditors can come in also as specialty creditors by virtue of the covenant, depends upon the question whether they could have sued Archibald Gracie upon the covenant if he was now living; and upon a careful examination of the terms of the assignment, and considering it as a personal covenant with each creditor, and not an assignment of the fund to such as should actually sign the instrument so as to make it a specific appropriation, I see no difficulty in the English creditors sustaining an action upon the covenant, either in their own names or at least in the names of the assignees. The funds assigned to Wilkes, Goodhue & J. G. King, were not to be paid over by them to the creditors who should neglect or refuse to become parties to the assignment within the times prescribed therein; and the English creditors did not in fact sign their names to the original assignment, though if the testimony of J. G. King, can be received as legal evidence in their favor, they did what *was [ *323 ] tantamount to it, and actually received their dividends under the assignment. And as all parties appear to have acquiesced in this manner of transacting the business and the distribution of the assigned fund, for more than ten years before the present controversy commenced, I think it mpst be considered as a substantial compliance with the agreement, and an acceptance of the assignment on the part of the English creditors.
The difficulty, however, of their being able to sue upon this covenant of Archibald Gracie, in their own names is, that the covenant is not made with all the creditors of A. Gracie and sons, who were mentioned in schedule A, who should assent to the assignment and accept dividends under the same. But he covenants with the parties of the second and third parts, which parties of the third part are declared to be such of the creditors mentioned in the schedule A, who should become parties to the indenture, that is, as I understand it, who should actually sign and seal the same. J. G. King, how *246 ever, is expressly covenanted with, as one of the parties of the second part, and that of itself would have enabled him to have sued upon the covenant either in his own name or in the names of himself and Wilkes and Goodhue, for the balance due to the firm of King & Gracie. And as this covenant to pay the balances to all of the creditors mentioned m schedule A, is made with the parties of the second part, as well as the parties of the third part, I think the parties of the second part might also sue upon the covenant as trustees for the other English creditors, who came in under the assignment and released the two junior members of the firm, and who neither neglected or refused to become formal parties thereto, as they never had the opportunity to see or sign it. Upon this ground, therefore I shall hold the English creditors entitled to the privileges of specialty creditors also, in the administration of the estate of Archibald Gracie.
The result is, that in conformity with the decision of the court for the correction of errors, N. Rogers is not to be put upon a perfect equality with the other creditors with respect to the French fund; he is to be permitted to retain for the debts in which he had an interest, as mentioned [ *324 ] in schedule *A, in preference to any of the other creditors mentioned in that schedule, and in preference to other specialty creditors of A. Gracie ; and that the other creditors mentioned in schedule A, are to be paid pro rata, as between themselves and other specialty creditors, and in preference to creditors by simple contract.
A reference must therefore be made to Master Ullman or Master Sidell, to take an account of the debts due to any of the parties to the suit, or any other creditors of the estate of A. Gracie, whether by judgment or decree, specialty or otherwise, and to state the class to which such debts belong, placing the debts of the parties to this suit in the classes to which they belong, as above declared, and directing the several creditors to come in and prove their debts within the time fixed by the master, in conformity to the statute on that subject; and the master is also to state the account of the executor, Nehemiah Rogers, charging him with interest as shall be equitable, with liberty to make a special report as to the fund in his hands, and of the amount due for which he is entitled to retain, to the end that the surplus, if any, may be brought into court and invested, to abide the event of the suit.
The motion to suppress the testimony of Samuel Rogers must be denied. The complainant’s counsel having consented to his examination on his voir dire, and he showing that he had no interest in behalf of the party calling him, it was too late to make an objection to him afterwards. His testimony must therefore be retained, subject to all proper objections to his credibility. I see no legal objection to Charles King as a witness, as he does not appear to have any personal interest whatever in these conflicting claims, or to increase or to diminish the fund in the bands of N. Rogers, the executor. *247 W illiam Gracie shows that he would have an interest in increasing the fund, if the amount of the-estate was sufficient to pay off the debts, so as to leave any thing for distribution. He also has a claim as a bond creditor of A. Gracie, which had not been released to the defendant, Nehemiah Rogers, the executor, when he was examined as a witness. He had therefore a direct interest in deducing the debt which N. Rogers was [ *325 ] to retain for his debt, and to increase the fund in the hands of the executor. His deposition must therefore be suppressed.
James G. King was a competent witness in relation to the English creditors having accepted the terms of the assignment and discharged the junior members of the firm, as in testifying in support of their claims to come in as specialty creditors under the covenant he was testifying against his interest. But as his wife is interested in reducing the claim of N. Rogers, he cannot be a witness as to any matter which is for her benefit, although he has no personal interest in the estate of Rufus King. He has also an interest against Rogers, as one of the former firm of King & Gracie, of Liverpool. So much of his testimony therefore, as relates to moneys supposed to have been received under the Spanish claim, or the freight of the ship America, by N. Rogers, or any member of the firm of Nehemiah Rogers & Sons, must be suppressed.
In relation to the freight claim received by S. Rogers, I see nothing at present to charge N. Rogers with it, or the firm with which he was once connected. It appears to have been received by Samuel Rogers as an individual. But if the firm was in any wray benefited by that money, it ought to go to reduce the claim of N. Rogers, to retain, beyond the amount of the time and expenditúres necessary for the collection of the money. A. Gracie was insolvent, and’ had no right to give away his property to the injury of his creditors. I shall therefore, permit the master to take further testimony in relation to that money, and to reduce the claim of N. Rogers accordingly, if it shall appear that he should be charged with it either on the ground that he or his firm received it, or that he could have legally collected it of Samuel Rogers, in his character of executor of Archibald Gracie.
From the decree of the chancellor, HosacFs executors and Alexander Baring, Francisco Be Zavala and others, appealed to this court.
* Points submitted and argued on the part of Hosack’s Exe- [ *326 ] CUTORS.
1st. Nehemiah Rogers, as executor, must be decreed to account for all the assets of his testator, A. Gracie, according to a legal course of administration, as the law was, prior to 1830.
2d. The assignment and release of 27th April, 1824, did not change the *248 original indebtedness of A. Gracie, whether consisting of judgment, bonds or parol contracts. See opinions of Judge Cowen and Senator Dickinson, in this cause, 18 Wendell, 336, 347.
3d. The judgment of A. Hosack is entitled to priority over the demand of N. Rogers, which is upon parol contract.
4th. If the covenant in the assignment of April 27,1824, be resorted to by N. Rogers to raise his debt to the rank of a specialty, it is still but a covenant debt, and inferior in rank to the judgment in favor of A. Hosack.
5th. Samuel Rogers is a party defendant in the suit, and interested in its result. He has not released his interest, and he is entitled to call upon N. Rogers, to account for any money, recovered from the estate of A. Gracie; and his deposition must be suppressed whenever his interest appears. Allen v. Blanchard, 9 Cowen, 633 ; Evans v. Eaton, 1 Peters, 322; Needham v. Smith, 2 Vern. 463 ; Swift v. Dean, 6 John. Rep. 523; Starkie on Evidence, 745 ; 1 Coxe Rep. 46 ; Hardin Rep. 50 ; 3 Cowen, 252.
6th. The transfers to Samuel Rogers by A. Gracie, can be sustained only by being deemed payments on the debts due to N. Rogers & Sons. They were made to a member of the creditor house by the debtor, and the amount ought to be deducted from the amount due to N. Rogers & Sons. If not so applied, then Samuel Rogers was accountable to N. Rogers as executor for the sum paid under the Spanish treaty, and the latter should be charged with the debt which he has suffered to become irrecoverable under the statute of limitations.
7th. N. Rogers, as executor claiming a right of retainer, is to be charged with the receipts by his partner, Samuel Rogers, from the estate of A. Gracie, i. e. Nov. 11, 1824, $6,544.41, and the Spanish claim, say §3,500.
[ *327 ] *8th. N. Rogers having admitted that he has in his hands a large surplus fund belonging to the estate of A. Gracie, beyond any debt claimed by him, ought to be decreed forthwith to bring into court the amount of the judgment of A, Hosack, to abide the event of the suit. Rothwell v. Rothwell, 2 Sim. & St. 217 ; Strange v. Harris, 3 Bro. Ch. C. 627 ; Blake v. Blake, Schoales & Lefroy, 26 ; Yare v. Harrison, 2 Coxe Ch. Cas. 377 ; Mortlocke v. Lathe, 2 Mer. 491; Cocks v. Nash, 9 Bing. 341.

Points submitted and argued on the part of A. Baring and others, creditors, and P. de Zavala, a bond creditor.

I. The arrangement contained in the deed of April 27, 1824, was a general composition agreement between debtors and their creditors, and it contemplated and is to be so construed, placing all creditors on the principle of a payment, without preference and of rateable payment, upon the re *249 ceipt of the French funds. Ellis, Debtor and Creditor, 204. Newland on Contracts, 414. 1 Story’s Equity, 370, 8, 9. Rose v. Leicester, 4 East R. 372. Morrice v. Bank of England, 2 Cases Temp., Talbot, 218. Wadeson v. Richards, 1 Ves. & Bea. 103,110. McKenzie v. McKenzie, 16 Vesey, 372. Sadler v. Jackson, 15 Id. 52. Sothman v. Mitchel, 13 Id. 581. The covenant was several for each debt. Withers v. Bircham, 8 Barn. & Cresswell, 254. (10 C. L. R. 68.)
II. The evident purpose, as well as the language of the deed, require its operation as a release of all antecedent remedies, and as a substitution of a new remedy by covenant, rateably and equally in behalf of each creditor.
HI. The release of two of three joint debtors upon the consideration of the new covenant for the creditors, was a discharge in law of the existing remedies, and the substitution of a new remedy. (This can only be controverted by Hosack’s executors; all the other parties to the suit acquiesce in this part of the decree of April 22,1840, and upon them is conclusive.) Co. Litt. 232, n. 1. Rowley v. Stoddard, 7 Johns. R. 207.
IV. ’rThe death of A. Gracie took away the remedy at law [ *328 ] against the personal estate of A. Gracie upon his original joint debt, and the creditors were confined to their remedy upon his several covenants, or to a resort to equity. In either case a rateable payment is the rule. Hopton v. Dryden, Prec. Ch. 181. Ram on Assets, 271, (8 Law Library.)
V. If the creditors stand on the ground of equality and rateable payment, the right of FT. Rogers, as executor, to retain, is limited to his rateable proportion of the French funds.
VI. If, by the covenant, FT. Rogers’ debt was raised to the rank of specialty to that amount, then, if the prior remedies are unreleased, the judgments and bonds are to rank for their full amounts, and the simple contract creditors only for their rateable amounts.
Boints on the part of Respondents, FT. Rogers and others.
I. The scope, object, and manifest intention of the indenture of April 27th, 1824, was to discharge Archibald Gracie from his original contracts and liabilities, such as the judgments, notes, bonds, &c., and to take, in the place of the joint contracts and liabilities of the partners, the separate individual liability of Archibald Gracie, under his covenant to pay out of his claims on the French government.
II. That such, was the intention is manifest from the very instrument itself ; from A. Gracie’s divesting himself of all control over his claim on the English government; from the acceptance by the creditors of the dividends from the English claims, computed on the footing of the schedule debts; from the acts of the parties themselves; from the execution of the assign- *250 merit in 1824, down to the time of filing the bill; from the frame of the bill itself; the previous grounds and arguments of the counsel for the judgment creditors, that A. Gracie was released from the judgments against A. Gracie & Sons ; and from the covenant of A. Gracie, that the balance of his schedule debts (not the judgments) shall be made up and paid out of his claims on the French government.
A covenant is to be considered with the context, Marvin v. Stone, 2 Cow. 781. Recitals in a'deed are a key to the construction. 5 Russ. 330.
[ *329 ] *Deed construed according to intent, to be collected from the recitals and provisions of the deed. Lester v. Garland, 1 Mont. 471. 2 Bac. Abr. 290. If man. accepts an obligation for debt due by simple contract, this extinguishes the contract.
III. If such was the intention, A. Gracie was discharged, of course, from his original liabilities in equity as well as at law; if such was not the intention, he is discharged at law, supposing him to remain liable in equity. The rule is indisputable as a general one, that the discharge of one partner or joint debtor, discharges the others, to which there are but two exceptions : one is where it was not the intention to discharge him, and NO new agreement to BE liable. In that case he is discharged at law, though not in equity. The other exception is, where, in consenting to the discharge of the other, he enters into a new agreement to pay, in which case the old liability or contract is extinguished, but he is liable on his new agreement. In the present'ease there is no express agreement to remain bound on the original contracts, and no implied one can be raised, because that is entirely done away with, by the express agreement, viz., the covenant; and the maxim, “ expressio unius est exclusio alterius ;” or, “ expressum facit cessare taciturn,” applies with peculiar force, because the covenant to pay when recovered, is incompatible with a present absolute indebtedness under the original contracts. William Gracie and Charles King, after their release, had a right to have the judgments against them satisfied of record. They could not be satisfied of record as to one, without being so as to all. This would be an anomaly.
To the point that a release of one discharges the other, see 7 John. Rep. 209, Rowley v. Stoddard; Gow on Partnership, 202, 229, (ed. of 1830 ;) Chitty on Contracts, p. 296, and cases cited; 1 Peters, C. C. Rep. 307, Consequa v. Wellings; 9 Cowen, 38, Catskill Bank v. Messenger; 2 Saunders, 48, 2 Brod. & Bing. 38, Solly v. Forbes; 4 Wend. 366, Brown v. Williams; 2 John. Rep. 471, Thompson v. Thompson; 9 Wendell, 336, De Zeng v. Bailey and others; 1 Rawle, 391, Milliken v. Brown; 6 Taunt. 289, Hutton v. Eyre; 18 John. Rep. 459, Robertson [ *330 ] v. Smith; *5 vol. Bac. Abr., p. 702, lays down the rule that a *251 release to one dischrges the other, because the joint remedy being one, the several is likewise. 18 Viner's Abr. Title Release, p. 352, lays down the rule on the ground of acknowledgment of satisfaction ; so do 9 Cowen; 4 Wend, and Chit, on Contracts, above cited. The following cases hold that a discharge of a debtor, -or of a debtor from- execution, discharges the judgment and debt, 6 Term R. 625, Clark v. Clements; 5 East, 147 ; 2 East, 243 ; 3 Wend. 184, Poucher v. Holly; 9 Cowen, 128, 8 Id. 171, Lathrop v. Briggs; 5 John. Rep. 364, Yates v. Van Rensselaer and others, was the case of a consent expressly given, to remain bound, yet held he was discharged. 8 John. 262, McLean v. Whiting, recognizes that the release of a defendant from execution, and of a co-obligor from a debt, depend on the same principle. To the point that an implied promise can exist only in the absence of an express promise, Chit, on Contracts, p. 6, edit, of 1834; 2 Term Rep. 104-5 ; 6 Id. 320 ; 7 Id. 385, 568; 3 East, 185; 2 M. & S. 316; 3 Chit. Com. Law, p. 4; 11 John. 122, Van Derken v. Van Derken, holds that an express covenant in a deed takes away all implied’ covenants.
To the point that on a joint contract all must be sued, see 18 John. Rep. 459 ; Chitty on Plead. 1 vol. 29, 30, 31, edit, of 1825. Ellis on Debtor and Creditor.
IV. If Archibald Gracie was discharged at law, though not in equity, it is clear, and indeed admitted, that the judgment of Hosack would not in that case be entitled to a preference..
V. If no release had been given to Charles King and William Gracie, and the original contracts and liabilities therefore unaffected bt ant release, still these contracts would have been extinguished at law, on the death of A. Gracie, (he leaving partners surviving,) and Archibald Gracie’s representative could not be held liable at law, on the original contracts-and liabilities, as they would have survived against the surviving partners. Archibald Gracie, therefore, cannot be held by means of the release, when he would not have been, had there been no release.’ A release cannot "have the effect of creating or keeping alive a liability, [ *331 J when none such would have been created or kept alive at law without it. The only remedy, therefore, against Archibald Gracie’s representative, in case no release had been executed, would have been in equity, and then only in case of the insolvency of the surviving partners ; conse? quently the judgments would have no right of priority, Gow. on Part.; Collyer on Part.; Williams on Executors, p. 1071-2 ; Saund. on Pleadings and Evid. 2 vol. p. 25. To the point that in case of a joint contract, if one of the parties dies his executor is discharged at law from all liability, and the survivor can alone be sued; Chit. on Plead., 1 vol. p. 39, edit, of 1825; Dunlap's Pr., 1 vol. p. 32; Chit. on Bills, 32 edit, of 1826 ; 5 *252 Bac. Abr., 163 ; Com. on Contracts, 1 vol. p. 327, edit, of 1828; 6 Cow. 441, Murray v. Mumford ; 2 John. ch. 509; 6 Id. 249; 1 Gal. 361, 630; 1 Wendell, 148, Grant v. Shurter. If joint judgment be against two, the scire facias must be against both, 2 Dunl. Pr. 1089 ; Salk. 598; 6 Term Rep. 1, Mann v. Quin ; 1 Mawle & Sel. 242, Fort v. Oliver ; 2 vol. Archb. Pr. 81, 82.
VI. Independent of the foregoing grounds, the separate individual covenant of A. Gracie, was an extinguishment, or in the language of the civil law, a novation of the joint contracts of the firm. The identure was an instrument of assignment, release and covenant. It was not any one of them, but it was all three. It was one entire instrument, contemplating an entire new arrangement between the parties ; creating new and different rights, liabilities, and relations. The debtors parted with all' control over the English claims—gave it to the creditors, rateably, whether by judgment or otherwise. The creditors, on the other hand, release the original indebtedness, substituting in the place of the old joint relations and liabilities, the new separate and individual liability of A. Gracie, to pay out of his separate individual property, when recovered from the French government; Williams v. Hodgson, 2 Harris & John. 474. A bond given by one partner for simple contract debt, is by operation of law, a release of the [ *332 ] other partners, and extinguishes *the debt at law and in equity; Tom v. Goodrich, 2 John. 220 ; Arnold v. Camp, 12 Johnson, 409; Bac. Abr.p. 290.
VII. The creditors of A. Gracie, who became parties to the assignment, took the instrument altogether—they could not accept part and reject part. If they accepted the assignment of the English claims, they also accepted the covenant as to the French claims; and accepting that covenant, must look to it as their remedy, and are estopped from looking to any remedy inconsistent therewith.
VIII. It was not the intention of Archibald Gracie to compound with his creditors, but only by the covenant to postpone his liability and the time of payment, to the period when his French claims should be bona fide adjusted and recovered, whatever might be the sum allowed therefor ; as at the time he entered into the covenant, he fully believed if he ever recovered any thing, he would recover more than sufficient to pay his debts, and leave a large surplus beyond.
IX. The true meaning, construction and effect of the covenant is, that it is a covenant with each particular creditor, to pay him his debt in full, or in the words of the covenant, that the balance of his debt “ shall be made up, and paid, out of any moneys which shall or may be recovered” on account of the claims on the French government, and on which each creditor could sue $t law for, and recover the balance of his debt without *253 reference to the debts of the other creditors, substituting one liability for another, co-extensive with the former ; it fully appearing by the proofs, that he believed he should recover more than sufficient to pay the balance of his debts.
16 John., 172, Jackson v. Blodget, and 3 John., 375, Jackson v. Hudson, lay down the rule as follows: “ Where a deed may enure in different ways, the person to whom it is made shall have his election which way to take it, and may take it in the way most favorable to him.” In other words most unfavorable to the grantor, cite 4 Cr. Dig. title 32, ch. 23 ; Sheph. Touchstone, 82, 83 ; 5 Russ. 330 ; 2 Cow. 781—195. To the point of the covenant being a several covenant *on which each [ *333 ] creditor could sue. See 5 Dowl. & Ryl. 106. 3 Barn. & Cr. 254. 5 Price 529. 1 Saund. 153, 1 Chit. on Plea. p. 3 & 6—and cases there cited, ed. 1825. 10 Rarn. & Cr. 410, Servante v. James. 1 Johns. Ca. 319. 1 East, 407. 2 Mod. 82. Comyn’s Land. & Tenant, p. 308, ed. 1830—do. 456. 8 Mass. 462, Ludlow v. McRae, 1 Wend. 228.
X. All the creditors, therefore, who became parties to the instrument, stand, so far as the dignity of their demands is concerned, upon the equal ■ footing of specialty creditors, for the full amount of the balance of their debts.
XI. X. Rogers, consequently, as executor, is by the former decree of this court entitled to retain the amount of the balance due him as against the other creditors! all being of the same degree.
XII. Samuel Rogers is a competent witness, and the objection to him, if otherwise valid, is now too late. Clarkson v. Carter, 3 Cowen 84. To the point that one partner releasing his interest to his co-partner, is a competent witness for the latter, 4 Taunt 326, Heath v. Hale. Also to the point that a creditor releasing his interest is competent to increase the fund, and that an assignment of a debt may be as well by parol as by deed, 7 Cow. 266. Wheré objection to witness arises from his answer on the voir dire, it may likewise be removed on the voir dire. Phill. Evid. 96. 1 Dall. 272. 1 Mass. R. 219. Peake’s Evid. 186. 10 Mod 193. 3 Day, 214. 15 East. 57. 18 Wend. 472, 489, Stall v. Catskill Bank.
XIII. The English creditors having neglected to execute the articles of 27th April, 1824, cannot claim the benefit of the covenant contained in them, and their debts are barred by the statute of limitations.
XIV. The special promise made by A. Gracie, to pay the debt of X. Rogers out of the first moneys from any source that he could ever command, was a valid and binding engagement.
Lastly.—If the covenant of A. Gracie was to pay his debts only to the xtent of the moneys he might recover from France, still Xehemiah Rogers *254 [ *334 ] would be entitled to retain to *the full amount of his claim, if it did not exceed the whole amount of the French recovery.
The case was argued in this court by
J. Blunt & S. Stevens, for Hosacks’s executors.
D. Lord, Jr., for A. Baring and others.
A. G. Rogers & D. B. Ogden, for the respondent.
After advisement the following opinions were delivered :
By Chief Justice Nelson
: From a review of the history of this case, it is apparent, that the former decree anticipated, and attempted to settle principles of law not involved in the appeal: and which had been expressly reserved by the chancellor for the final bearing. The simple point, both before him and the vice-chancellor, and upon which they were required to pass and did pass, was, as to the temporary custody and safe keeping of the fund : whether the executor or the clerk of the court should have its custody, pending the controversy, and until a final distribution. It was one comparatively unimportant, as it had no controlling or binding effect upon the merits, and was directed solely to the preservation of the fund for the common benefit of all parties concerned. The cause was scarcely at issue on the pleadings at the time ; and no proofs had been taken on either side ; it was not therefore in a state of preparation, which the course of proceedings in the court of chancery allowed the parties before a final hearing, or which would enable the cause to act understandingly upon the subject matter. It was not only not matured for final adjustment here, but as respects the merits, can scarcely be said to have begun; nor was the case presented to the court in that aspect; nor could any party have anticipated any decision thereon.
It is true, the chancellor, in assigning reasons for the exercise of his discretion, as to the proper custody of the fund pending the litigation, looked to the probable amount that might ultimately belong to the executor, and expressed his impression as to the true construction of the cornil *335 ] position *deed, allowing him to retain for the time being that amount. This court taking a different preliminary view of the matter, and believing the fund safe in his hands came to the conclusion that the executor should continue in the custody of the whole. The true constriction of the composition deed was not the point for decision before either *255 court. It was glanced at in advance, among many other matters proper to influence the discretion of the court upon this preliminary question; but, for no other purpose. Accordingly, we find it was not carried into the order of the chancellor appealed from, which is confined to the simple point brought before him, namely, the proper custody of the fund pending the litigation.
The case has since progressed to a final hearing; and the decree of the chancellor,[after pleadings and proofs, is now before us on the merits for review. I shall examine it, unembarrassed by any authoritative force of the former order of this court, beyond the point then legitimately presented: farther than this the parties are not bound, and we should be wanting in duty, to decline a full examination of the whole matter. Ho doctrine is more familiar, than that a judgment or decree can be final only for its own proper purpose and object, with strict reference to the subject matter of the suit, and upon the point thereby put in issue and directly determined. Phillips Ev. 334, 358, and Cowen & Hill's note, Pt. 2 n. 593. The effect of the former decree, therefore, does not depend upon what it may purport to decide; we must look to the subject matter of the appeal upon which it is founded, the point or points there involved, and thus ascertain the true question presented for adjudication, and give it effect accordingly.
As to the merits : In the view I have taken of the case, it will be unimportant to examine the question whether the release of the junior members of the firm of A. Grade Sons, by the creditors, operated as a technical discharge of their original demands; for looking at the whole instrument, I am entirely satisfied upon a fair interpretation it was the meaning of all parties that A. Grracie should be personally liable no farther than to collect and apply the French funds. It is a composition deed with a bankrupt mercantile house, *and the avowed object of the arrange- [ *336 ] ment was to surrender its assets to the creditors, and be discharged. It refers to a schedule of the debts, and recites that the house were unable to pay them, but were willing to provide for the security and payment in the manner thereinafter mentioned. It then provides for the assignment of the English fund to trustees for the benefit of the creditors, and for an absolute release of the two junior members. Then follows the covenant in question of the other member, by which he agrees, in case of any deficiency in the assigned fund to satisfy the debts; that it should be made up out of any moneys he shall recover from the French government; and that such deficiency shall be paid when, and as soon as such moneys shall be received.
We thus perceive that the “ manner of security and payment” referred to by the parties, is afterwards particularly pointed out in the instrument: that is, by the assignment of the English fund, and the application of the French to any deficiency. Each creditor, under his hand and seal, has *256 agreed to this mode of payment, and it is not denied but the obligation is binding. The house say to their creditors, we are at present unable to pay, but we are willing to provide for the payment in a certain way, upon certain conditions. The creditors agree, and the arrangement is entered into accordingly. After this, with what propriety can they claim any thing more ? It is said the senior member (A. Gracie) is not discharged, by reason of his covenant. But how far did he make himself personally liable thereby ? Certainly, not for the debts of the house. The language of the covenant imports no such obligation ; but the contrary. He agrees to pay the deficiency out of his claims upon the French government, when, and as soon as they shall be received. The obligation is expressly limited to this fund, and the claim upon him for that postponed, in terms, until he can obtain it. Until then, it is conceded, he is not bound for any thing ; and it is equally certain that on the happening of the event, the liability is limited to its faithful application.
Looking, therefore, at the composition deed, and gathering the [ *337 ] meaning from a consideration of all its parts, it seems to *me clear that it was intended to embrace a full and final arrangement of all the debts of the house, upon an observance of the conditions of which it was to be wholly exonerated from the debts.
Another view may be taken, more technical, but to my mind equally conclusive. The instrument is drawn with professional skill, and, it is to be presumed, with a perfect knowledge of the law. Now, no principle could have been more familiar to the draftsman, than that a release of the two junior members of the house would discharge the third : but it was competent to prevent this by an express clause. With this view the covenant of Archibald Gracie is annexed, and to this extent the operation of the rule is qualified, not by saving the original liability, for it contains no given stipulation, it simply binds him to a specified duty, namely, the application of the French fund. That is the whole extent of the qualification.
Then, as to the application of the fund: assuming the view I have taken of the covenant to be correct, it is clear it amounts, in legal effect, to a-specific appropriation. The creditors have no longer any general demand against their debtors; that they have waived or released in consideration of assets actually assigned, and the further right, in case of deficiency, to the benefit of the French fund. The latter constitutes a part of the consideration for giving up the general indebtedness ; the right is to the fund, as the personal liability exists only in respect to it. And then, whether we regard the terms of the covenant in the connection found, or the equitable rights of the creditors where no preference is given, the distribution, in case of made, quacy to full payment, should be pro rata. Indeed, this is conceded in one of the opinions delivered when the case was formerly here, provided it was *257 determined that the remedy of the creditors stood upon the composition deed: in other words, upon the covenant.
I am of opinion, therefore, that N. Bogers is not entitled to any preference in payment of his debt out of the avails of this fund over any others of the schedule creditors ; but that it must be distributed fro rata among the whole of them. I am the more confirmed in this _ conclusion for the reason, *that if the creditors should be held to stand upon [ *338 ] their original demands, independently of the composition deed, it inevitably follows, that this fund must be brought into the general assets of the estate, must be marshalled by the executor, and the debts paid according to their dignity. Judgment and specialty creditors would take preference over those of simple contract. There is no middle ground. The distribution must be an equitable one on the covenant, or a legal. one in due course of administration ; fro rata, or according to the dignity of the debts. The latter rule would disappoint the just expectations of the specialty and simple contract/ creditors, as it cannot be doubted, when they enteed into the arrangement, they supposed all were coming in on an equal footing. They were so placed in terms in respect to the fund assigned, and no reason for a distinction exists as to the other, which was intended to make up any deficiency.
Independently of the covenant the executor himself falls within the class of deferred creditors, and could not exercise his common law right of retainer, until all debts of a higher dignity were paid. Were we to adopt the construction contended for by his counsel, this would be the necessary result, as to him; it is only by taking this fund out of the general assets, and distributing it under the composition deed, that, he is placed upon an equality.
This disposes of all the questions directly brought up on the appeal, except as to the competency of Samuel Rogers as a witness; and as to that, whether the court below was right or not, in the ground upon which the decision was placed, the result I think correct. After the release I do not see how he can be interested. It is indifferent to him whether the fund he has received from Gracie be applied in abatement of N. Bogers’ claim against the estate, or not. He loses nothing in that event. If Nehemiah Bogers had not released, he might have recovered over against the witness to the amount of the sum thus abated by payment, which would have made him interested, but the release discharged him from any liability. If the moneys he received should be applied to the debt due N. Bogers, by the court below, the amount would come out of N. Bogers, and not the witness. *Neither can the point be very material, as the [ *339 ] chancellor took no final action upon the evidence, but. referred the subject to a master, to take further testimony.
There are some other assets besides the French fund, which it may be *258 material to notice. The insurance company moneys constitute, I believe, the greater part. As these moneys did not arise out of any portion of the French claims, they are independent of the covenant, and are to be deemed general assets, to be disposed of in the course of distribution at law. The amount of this fund will be ascertained by the master, to whom the court below made a reference, as well as the amount and nature of the debts to which it is applicable.
As all the debts of the schedule creditors, according to my view of the case, were compounded and discharged, by the composition deed, none of these can participate in the general assets, unless a subsequent revival of the debts can be shewn. There may be other creditors; if not, the chancellor will distribute it to the proper representatives. All these are questions which wi-11 depend upon the" testimony to be taken before the master, and should not now be anticipated.
For these reasons I shall vote for a reversal of the decree, with a view to declare a pro rata distribution of the French fund among the schedule creditors.
By Cower, J.
The articles of 27th April, 1824, provided for three objects : first, the distribution of the British funds pro rata among the creditors, by means of a trust; secondly, the two young men, but not Archibald Grade, were expressly released; and thirdly, Arch. Grade alone covenanted to make up and pay the deficiéncyout of any moneys which he might obtain from the French fund. The debts secured were each mentioned in a schedule annexed ¿o the articles, in which Hosack’s debt is set down as already in judgment. Part payment was made from the British fund during Archibald Gracie’s life time. He then died, leaving Nehemiah Rogers his executor, between whom and the creditors of A. Grade a question is persented on the extent to which the executor shall be allowed to retain. This is a mere [ *340 ] question of preference, and depends on the 'legal effect of the articles. If A. Grade was not released by them, Hosack’s executors and other judgment creditors are entitled to be first paid; then specialty creditors, if any there be ; then simple contract creditors, among whom are Nehemiah Rogers and the Barings ; andj as between them N. Rogers takes preference. On the other hand, if Archibald Grade was released, all the creditors must come in as covenantees severally, at least in respect to the French fund. The chancellor considers the articles as a simple act of novation, operating to release all three of the debtors from their original debts, and renewing them by the covenant as against A. Gracie alone. After hearing the former argument, no one, I believe, thought.the to be so, at least no one expressed an opinion that it was so. The question then stood connected with the temporary disposition of the fund; whe *259 ther N. Rogers should hold it, or pay it into court. The question of release, I admit, was not essential; but it had a material bearing, and was fully argued and considered. Mr. Rogers himself contended that A. Oracle was not released. None but the counsel of the Barings stood out. Senator Dickinson and myself clearly agreed with Mr. Rogers, and so expressed ourselves. Since that time a different ground has, it seems, been taken by Mr. Rogers in the court below, and the learned chancellor has adopted it. The court, therefore, will excuse my bestowing some attention on the question. I have not been able to follow Mr. Rogers in his change. Bat the power to qualify a release of this description being conceded by the chief justice, as I think it must be by the other members of the court, the point of law is in a fair way of being settled. For one, I feel little anxiety as to its application in the particular case before us ; and although I have felt no doubt on this head, I am not surprised that others should differ from me, on what is a question of construction upon the words of a written instrument. That A. Grade was released in terms, is not pretended; and that he and all the-other parties intended he should not be released, has been, to my mind, equally clear. The young men alone are mentioned, and discharged in the most formal words : The creditors *remise, [ *341 ] release and forever discharge William, Grade and Charles King from all demands. So far from any words looking to a discharge of their father from the same demands, or any demands, they are not even content with retaining his general liability; but they exact, over and above, a special covenant from him that he will make up any deficiency in the British fund out of what he may obtain from France. He, himself, puts his hand and seal to a paper, which thus omits to release him. If he or any body else intended that he should be released, the method was obvious. It was only to insert his name; on the other hand, he and others withholding that name, and inserting those of his sons, leaves it impossible for me to look at the articles and deny that all parties intended he should stand liable generally and personally, the same as before their execution ; that all parties intended to discharge the young men, and them alone. But it is supposed that the inference of such an intent is rebutted by the covenant to appropriate the French fund. To my mind, it is evident that this was intended only as an additional collateral security. It was intended to be a pledge of so much to secure the debts for which he studiously remained liable. Surely we are not to be told that a pledge or other collateral security shall operate to release a debt. The covenant is no more, nay, it is not so much as a mortgage would have been, with condition to pay the balance; or the assignment of a chose in action with the like condition. This covenant came short of either; it did not even amount to an assignment creating $ specific lien; and for this, also, the counsel of Mr. Rogers successfully contend^ when *260 the case was here before. That covenant of itself, therefore, had not the least effect as a discharge even of the simple contract debts ; for though the taking a specialty generally, for such claims, it being security of a higher degree, would have operated as an extinguishment, yet that will not be so where it is intended as a collateral security. This was the very point decided in Day v. Leal, 14 Johns. R. 404. That a covenant to pay a judgment should operate as a release, no one would pretend. It is inferior [ *342 ] in degree. The covenant *of A. Grade, therefore, in itself, would not affect the original debts one way or the other.
Nor can I bring my mind to regard the covenant as any argument against the obvious intent that A. Gracie should not be released. To warrant such an inference, there must be something incompatible in it with the original liability. It was the most natural thing in the world, that, in addition to the personal security of a mere bankrupt, the creditors should be anxious to throw what additional guard they could around any specific fund, which looked like a resource for payment.
We are thus brought back to the effect of the simple releasing clause. To-my mind, it must stand or fall by itself; and certainly it is not rendered more broadly operative than if the covenant to pay out of the French fund had never been inserted. It comes to a joint debt of three persons, and a release of two only. Many cases were quoted on the argument to prove, what no one ever disputed since the days of Littleton, that such a release would be, in ordinary legal effect, a discharge of a third debtor. I speak of a general, direct and unqualified release, under seal. Farther than this the authorities do not go; and when we get beyond such a release, they are all the other way. They all agree that a creditor may release one of his several joint debtors, without discharging the other ; and there are a number of cases where this has been allowed, even without the consent or knowledge of the other. The leading English case is Solly v. Forbes, 2 Brod. & Bing. 38; 4 Moore, 448. There the creditor executed a technical release to ono of two joint debtors ; but the release added a proviso that it should not operate so as to discharge the other; and its legal effect was held to be narrowed accordingly. Lord Oh. Justice Dallas said, of the intention of the parties no doubt could be entertained, and so to construe the release as to make it a discharge of both, would make it operate not to effectuate, but to defeat the intent of the parties.
The question came before Chancellor Kent, in Kirby v. Taylor, 6 Johns. Ch. R. 242. Four persons were bound in one bond, viz : Dun- [ *343 ] lap, Thompson, Turner, and Taylor. *They were bound to Maria " Kirby. The three first were her guardians, and they, together with Taylor as their surety, became jointly and severally bound for the faithful performance of all three as guardians, at least so far as they might act *261 jointly in their office. Maria came of age, and released Thompson, one of her guardians, reciting that she had settled with him ; but added a proviso that the release should not discharge Turner. On a bill filed against all the guardians, Taylor, the surety, pie aded the release, insisting that it being to one of four joint debtors it discharged all. Chancellor Kent held not; and that it discharged Thompson only.
I am aware that this case afterwards came before Chancellor Sanford, and went off upon another point. Hopk. Ch. Rep. 309, 333-4; but his view of the case detracted nothing from the force of Chancellor Kent’s reasoning. The latter said, “ The rule of law is, that if two persons be bound jointly and severally in an obligation, and the obligee releases one of them, both are discharged, and may plead the release in bar; for every man’s deed shall be taken most strongly against himself. But equity will not give a release an operation beyond the intent of the parties, and the justice of the case. It is common in equity to restrain a general release to what was under consideration at the time of giving it. A release is to be construed according to the intent and object of it, and that intent will control and limit its operation.”
In Cocks v. Nash, 9 Bing. 341, the question was again raised and noticed incidentally in the English C. P., A. D. 1832. Two persons being jointly bound in a bond, the obligee released one of them under seal, the other being present and agreeing by parol that it should not operate to release him. The court held that the agreement being by parol would not qualify the release. This, however, was merely because it was by parol. They agreed that if evidence of an intent to qualify it could be derived from the paper itself, it would not discharge the other. Tindal, Ch. J. distinguished the case from Solly v. Forbes, saying the effect of the deed was there collectable from the instrument itself. Gaselee, J. said, in all the cases the court has extracted the meaning of the parties from the deed itself. Bosanquet, J. *said the release operated as a [ *344 ] discharge of the other debtor, unless something was shown to alter its effect, and that a deed of release may be explained by recital or other matter contained in the same deed. The case turned, however, merely on the rule of evidence, that the effect of a written contract cannot be changed by any oral agreement of the parties at the time. Had the other debtor been a party to the release, as A. Gracie was here, the intent still to hold him being manifest, there can be no doubt that the decision would have been the other way. The rule held by Chancellor Kent and the English cases was also declared and acted upon by Marshall, Ch. J. in Garnett v. Macon, 6 Call. 308, 340. 2 Brockenbr. 185, S. C. In Catskill Bank v. Messenger, 9 Cowen, 38, Savage, Ch. J. said “ a technical release to one is a bar as to all others, because it is an admission by the creditor that *262 the debt is paid.” The supreme court of New-Jersey in Crane’s Administrators v. Alling, 3 Green, 425-6, adopt this reason; and infer that the release there in question could not have that effect, because it expressly admitted a part to remain due.
I have now shown that, both at law and in equity, one rule at least is clear, viz: that where, on releasing one joint debtor, it appears, either in express words, or by necessary inference from the nature of the transaction, that the release was not intended to discharge the other, he cannot avail himself of it. I speak of a case where the fact is apparent on the face of the paper.
I am strongly inclined to think that, in equity, (and we are now sitting on the equity side,) the common law rule that a discharge of one joint debtor shall operate to discharge another, does not prevail at all; that barely omitting the name of the other, is there to be received as sufficient evidence of an intent that he should not be discharged. I understand the decision of Chancellor Kent, in Kirby v. Taylor, to be, that when you discharge one of two joint debtors, you shall be understood to mean what you say, and no more than what you say, though the construction would be more severe against you at law. The decision is so understood by emi- [ *345 ] nent jurists in the neighboring states. The *question was incidentally considered by the supreme court of Pennsylvania, in Milliken v. Brown, 1 Rawle, 401. In that case Mr. Justice Tod said, “ I would be almost ready to say it would be against all equity, that a party should be thus entrapped by his ignorance and by the formality of a seal into the loss of two-thirds of his debt.” And he states the rule of Chancellor Kent to be, that a release under seal given to one joint obligor, should discharge him only, and not the rest.” The same rule was also cited and approved by Gibson, C. J. in M'Lenachan v. The Commonwealth, 1 Rawle, 361. He said “ at law, the release of one joint and several obligor undoubtedly discharges all; but equity restrains all general and sweeping expressions which are inconsistent with the actual intention.’.’ In Claggett v. Salmon, 5 Gill & John. 314, 350—1, the supreme court of appeals of Maryland also stated and approved of the rule. They stated it to be, that where two or more persons are jointly and severally bound in one obligation, a release of one obligor entirely discharges the rest at law; but not strictly so in equity ; for equity will not extend the operation of a release beyond the clear intention of the parties and the justice of the case, but will construe it to relate to the particular matter intended to be released.” The same rule has been repeated and recognized by the superior court of Georgia. Norris v. Ham, R. M. Charlton’s Rep. 267. Against the rule thus stated, I have seen no adjudged case, save that of Joy v. Wurtz, 2 Wash. C. C. Rep. 266 ; and the dictum cited on the argument from 1 *263 Pet. C. C. Rep. 307. This dictum when taken in its full extent will be found contrary to all the authorities, both at law and in equity.
On the whole, I must, therefore, be allowed to hold that whether the release before us be considered on the side of law or equity, the rule is clearly against Mr. Rogers on authority, even supposing his testator to have been a stranger to the transaction.
I had also supposed that, even in this limited point of view, both law and equity are in strict accordance with what *would [ *346 ] be the common sense construction of such an instrument.
But while on the subject of common sense, I may as well come to the case as it is. The truth makes it much stronger against Rogers, than any of the cases I have so far considered. It makes A. Gracie a party to this release and to the whole arrangement. He fixed his hand and seal to it. It is no longer the mere ex parte intent of the creditors. He joins them. The words of the article are the words of both parties. He says, “ I secure a part. Discharge the young men. I consent that my name shall be omitted in the releasing clause; and I covenant that if I ever get any thing from France, that shall be applied to discharge the balance.” In the tribunal of common sense and common honesty, does not the bare statement of the case, in the hearing of a man of business and observation supersede all argument ? What is now the answer of Mr. Rogers’ counsel ? I mean his present counsel; because I shall shortly make an appeal to his counsel three years ago. What is the answer of his counsel now ? It is this : By the consent of A. Gracie, his creditors refused to release him in terms; therefore they intended he should be released by operation of law. By the express consent of all parties he was left out of the releasing clause, therefore he and his creditors intended he should be released. I have endeavored to show that such a course of argumentation is not known to the law; that it is still farther removed from equity, and that in the tribunal of common sense it was never heard of.
It was on this view of the case that we were, some three years ago, first introduced to the common sense of Mr. Justice Kennedy, an eminent judge in the supreme court of Pennsylvania, speaking for himself and the other distinguished members of that high tribunal. He delivered the opinion of the court in the case of Burson v. Kincaid, 3 Pennsyl. Rep. 57, a case of which the present members of this court lately heard much at Saratoga Springs, on the argument there. The point in question was the same on both arguments ; but for some reason unknown to me, counsel have in the interim, changed sides. On the first argument, *Mr. Rogers’ [ *347 ] counsel themselves contended, that A. Gracie was not released. I speak particularly of Mr. George Griffin, whom I wish to be understood as naming with the greatest respect. He then appeared for Mr. Rogers, *264 whose answer was then also before us. In that answer, it is true, as now stated, he had made the point, that the articles did in legal effect release his testator. Mr, Griffin was reminded of that by the opposite counsel; but he very properly treated it as binding on no one; not even on Mr. Rogers himself. It was but making a point of law, opposed to authority and principle. This he demonstrated with his usual ability, and with great force, and to my entire satisfaction. Those members of the court who were not present on that occasion, would hardly suppose, that Mr. Griffin read the opinion of Mr. Justice Kennedy at length, as a conclusive argument in favor of the point made by himself, and against the opposite point made by the answer. He followed it by insisting on the glaring absurdity, that Mr. A. Gracie, should be considered as released contrary to the obvious meaning of every body concerned. It is unnecessary for me now to notice the argument of Mr. Justice Kennedy. My own view of it is in the report by Mr. Wendell, 18 Wendell, 319. Mr. Senator Dickinson’s view of the same argument is also in the same report. I will advert to only one clause of it. Mr. Justice Kennedy takes the simple case of a release of one joint debtor with the consent of the other; and likens it to the tearing off one of two seals, by consent of two joint debtors on a bond. After putting the two cases upon a par, he treats the defence of the .man who has, by his own consent, thus agreed not to be discharged, as something worse than absurd. He says, that to give it sanction, “ would be a reproach upon the law and the administration of justice. It would be to permit the remaining obligor to violate most grossly his own agreement; to commit a palpable fraud upon the obligee, and cheat him out of his money.” In such language, I was appealed to by Mr. Rogers’ own counsel. He showed me .that I should violate not only authority and the principles of common sense, but of common honesty, by holding that Archibald Gracie was released. [ *348 ] *It was certainly somewhat with the enthusiasm displayed by the learned and venerable counsel, that I entered into his views. And I must beg leave to add the name of that counsel to the other authorities I have cited in support of what I still deem not only the clearly legal, but the clearly sensible and honest view of the case.
What I have said will perhaps serve at least as an apology for the error into which I may have fallen, • by following Mr. Justice Kennedy in my former opinion. I ought to make the same apology for my brothers Dickinson and Bronson, neither of whom are now in the cause ; but both of whom concurred with me—the latter in consultation, and the former in his reported opinion. The Chibe Justice did not hear the former argument; and so of several senators, for aught I'know, a majority, of those who heard the last argument. They therefore are not called upon to join with learned counsel in a change of ground. But no one, I believe, then supposed that *265 parties may not remodel and alter their contracts as they please. It is, in principle, the exact case put by Mr. Justice Kennedy, of their consent to tearing off one of their several names or seals. Those whose names and seals remain are still liable, the same as on a re-delivery or re-execution ; and this has been repeatedly held by authority. Speake v. The United States, 9 Cranch, 28 ; Cutts v. the same, 1 Gall, 69, 71; Barrington v. The Rank of Washington, 14 Serg. & Rawle, 423. A contract in the hands of all parties, is like clay in the hands of the potter. They may modify it as they please, by a separate defeasance, by removal and substitution of names, by a release total or partial.
When I say that A. Grade agreed by these articles that the releasing clause should not discharge himself, I desire not to be misunderstood. He certainly did not say so in those very words : but he did virtually say so, as clearly as if the intent had been written out. He signed, sealed and accepted a paper, releasing his sons, who were jointly liable with him, naming them, but not himself. I speak on the rules of construction and evidence; “ The mention of one person is the exclusion of another.” When A. Gracie consented that *the young men alone, and not himself, [ *349 ] should be named, he agreed to be excluded from the benefit of the release. A silent acceptance of the release with that omission is, in legal effect, equal to an express stipulation; “ he who is silent is considered as assenting, when his own convenience is the subject matter.” Mr. A. Gracie’s own convenience was in question, and he silently accepted the release from which his own name was excluded. Mr. Justice Kennedy, therefore, did no more than any jury of twelve men would have felt themselves, constrained to do. He took consent and agreement as the basis of con. struction, in a case where no man could have done otherwise. To my mind the legal inference was equally obvious with the fact upon which it rested.
It is now said that the opinion of this learned judge was out of the case in which he was speaking. That is a question on which men may differ; and I consider it enough for my purpose that his argument is now in point. We do not cite the decisions of neighboring states, nor even those of England since 1776, as having the force of authority. Since that year there are no adjudications binding upon this court, as such, except its own; and even these may be and sometimes are departed from, when found to be in obvious conflict with long settled principles. We look both to foreign judgments and foreign dicta much in the same light. We regard each, rather as evidence of the law than the laiv itself. We are mainly influenced by the .intrinsic force and reason embodied in the opinions of learned judges, without instituting an. inquiry to see whether the case itself circumstantially quadrates with the one before us. When Mr. Justice Kennedy, conceding the general rule assumes the very ease before us, and makes writtenkconsent, on the part of. *266 the joint debtor not named, an exception ; and sustains his point by legal reasons not only strong in themselves, but fortified by the reasons of numerous other eminent judges—reasons, too, which force conviction on the very counsel who are retained to oppose them—it becomes a question of minor importance whether the immediate case to which he was speaking may not be literally distinguishable from that to which his argument is [ *350 ] now applied. Whatever *the circumstances of Burson v. Kincaid may have been, it was not denied in the course of the former discussion, nor is it now, that the argument is exactly pertinent to the case in hand.
We are now, however, favored with one advantage upon the point, which we had not on the former argument. Mr. Griffin is withdrawn, and another very able gentleman substituted as senior counsel, who, the junior has told us himself drew the articles containing the release and other provisions. I presume it is meant to have us understand that this eminent counsel intended, at the time, so to frame the articles that A. Gracie should le released. The transaction, however, took place some sixteen years ago; and we have still to regret that we were not, after all, favored with the reason why, if he intended such an effect, he should have entirely omitted A. Gracie’s name, while he so carefully inserted those of the two young men alone. Now, after so long a time, and considering the philosophy of human memory, I have no doubt the learned gentleman himself, if the fact were material, would advise us, as matter of law, rather to govern ourselves by the mere face of the paper than the force of his unaided recollection. Cotemporaneous memoranda in such transactions also serve to refresh memory. Knowing this to be so, I have looked in order to see whether any' may have crept into the case; and I think I have found one which has a material bearing. It is under date of March 16th, 1824, being a circular which Archibald Gracie & Sons addressed to their creditors through their agents at Liverpool. It is in these words: “ We are pressing upon his majesty’s government the consideration of the claims of Archibald Gracie & Sons, for losses sustained during the late war, while they were employed in supplying the peninsula with flour, &c.; and we are in hopes that our exertions for our said friends may have a favorable result; and it is their determination that their debts, foreign and domestic, should be first provided for. But in case a sum short of satisfying the whole is not recovered, that whatever is received shall be appropriated rateably to each creditor’s claims, &c., and when such payment is made, that a release should le [ *351 ] granted and *executed to William, Gracie and Charles King; ■and that Archibald Gracie should only remain liable for any balance that might be still due, and which he trusts he will, from his individual claim upon the French government be soon able to discharge.” Now this *267 is precisely what I understand to have been done by the articles, which bear date about a month. after. The young men were released in terms ; A. Gracie was not so released. He therefore remained liable for the balance. The words in the circular are remain liable; not that he should be discharged, and enter into some new distinct liability, limited as it is by the covenant, to the French fund;»but the proposal is that he should remain liable for the whole balance. That he would do, if he were not released. We have abundant reason in this circular for seeing why his name was omitted, and why those of his sons were inserted. The covenant which was added did not provide that hé should remain liable. It was inserted merely with a view to secure the French fund, and in terms limited to that. If the draftsman, therefore, intended to act under the circular addressed to the creditors, as he must have done, from his known good faith, he failed in one essential particular," if we adopt the construction for which he now contends. Mr. A Grade did not continue responsible for the balance, as such, in.any way. It is certainly immaterial, in a legal point of view, what were the draftsman’s private intentions, provided he has failed to give them utterance in the articles. It is rather a matter of mere moral gratification ■ that, on looking to the instructions under which he acted, we find them fulfilled with his accustomed skill and integrity.
For one, therefore, I must still be excused in saying, I do not think that the counsel for Mr. Rogers have refuted their first argument. I think Archibald Gracie was not released from his original liability on the Hosach judgment; and that the decree of the court of chancery should be reversed because it has not allowed to that judgment the settled legal preference to which it is entitled, in a course of administration.
If I am mistaken, however, in supposing that A. Gracie was not released, still I think the learned chancellor erred in ^holding [ *352 ] that the covenant to pay the balance out of the French fund operated as a general novation. If he was released, his new covenant is not commensurate with his former general liability. The reasons why I think so, are already before the court in my former opinion with those which led me to suppose that Mr. Rogers cannot, in this view, take more than his rateable share. To these the chief justice has added several, in which I concur.
I do not perceive that the question whether the English creditors who omitted formally to execute the articles should be received to claim, is raised by the appeal. They acceded to the arrangement, and, by consent of all parties, were received and treated as -actual parties; and though not legally so, they were properly admitted by the chancellor to a share in the fund on equitable grounds. This view disposes of the point made by Rogers, on the statute of limitations, if that could properly he raised on the ease a§ it now stands-
*268 I also concur with the chancellor in that part of the decree which refuses to suppress the testimony of Samuel Rogers. I do so because I find nothing in his examination, either on the voir dire or in chief, which made him technically interested to testify in favor of N. Rogers, or any of the other defendants. The demand which N. Rogers is seeking to enforce the collection of, once belonged to the firm of N, Rogers & Sons, of which the witness was a member ; and so he would have been interested in the event of. this suit. But before the bill was filed, he had sold out his interest in it, to N. Rogers, who was, when the witness came to testify, sole owner of the demand. The other members of the firm released the witness, thus cutting off his accountability to them, and the main ground of the objection was, that, under a voluntary assignment to the witness, by A. Grade, when he was insolvent, the witness had obtained moneys which he ought to have applied on the debt in question, and accounted to 'the other members of the firm. Nor was he interested as having a right to insist. that the moneys now claimed by N. Rogers shall be applied as partnership effects, to pay . debts due from Rogers & Sons. This right is gone by his having . [ *353 ] sold all his interest in the debt on which those moneys are Claimed, to N. Rogers. To him they exclusively belonged, Nor can the creditors of Rogers & Sons follow the moneys specifically into the hands of N. Rogers, and prevent his using them as his own. They have ceased to be a share of the partnership effects, and taken the character of N. Rogers’ separate property. Nor can the witness be made personally liable to any of A. Gracie’s creditors, for not applying - the moneys he received in part payment of the debt in question, even admitting that it was his clear duty so to have done ; nor can he in this suit be made accountable for the moneys to A. Gracie’s creditors on any ground. ; The bill -is not framed with a view to that object. If he have fraudulently obtained funds which belong to them, this might form the subject of a distinct bill against the witness, to which, however, he would have a right to answer and go to an issue. In no point of view, that I see, is he interested in the event of this suit.
In the view, therefore, which I have taken of the question, it is not necessary to decide whether the complainants, having put Samuel Rogers to his voir dire, and failed to establish an interest in that form, are concluded against renewing their objection on his interest coming out upon his examination in chief or otherwise. How the practice on this point now stands in chancery, I have not stopped to inquire. At common law the cases are much in conflict; but the English- practice would now seem to warrant the objection, on the interest clearly appearing, at any stage of the trial, although the witness may have denied it- on his voir dire. 2 Stark. Ev. 756, note (p.) Am. ed. of 1828 ; 1 Phil. Ev. 132, and notes by Cowen & Hill, *269 pp. 708 and 1557 ; Id. Boston ed. of 1839, p. 140; Roscoe’s Civ. Ev. 80, and the cases cited in these hooks.
On the main question in the cause, however, I do not think it possible to sustain the decree. I am, therefore, for reversal.
By Senator Furman.
The appellants in this suit originally contended for an equality of partition of the funds in the hands of the executor, upon the ground that equality *among creditors is equity; [ *354 ] their debts being all upon the same footing. But this court, in examining this very claim in this same case, in 18 Wendell, 319, decided they were not entitled to such equal distribution; and that the executor having the legal priority as the law stood before the enactment of the Revised Statutes, was entitled to retain to the amount of his demand in preference to other creditors; which was undoubtedly the law as then applicable to the ease. The same appellants now claim, not that they are entitled to an equal distribution of the funds in the hands of the executor, but that they have a prior dignity by virtue of a judgment set forth in their bill, and that they are entitled to be paid the full amount of that judgment with interest before the executor can lawfully retain any portion of the fund. The bill in this case was filed in July, 1836 ; and it sets forth the judgment under which they now claim, not as a prior lien, or as a debt of higher dignity, but as an evidence of indebtedness; for the payment of which in equal proportions with the executor and other creditors of Archibald Grade, deceased, they sought the decree of this court on the former hearing.-
If there is anything which can be regarded as definitively settled and established by the judgment of this court, in 18 Wendell, 319, it is that the appellants were not entitled to. such an equal distribution upon their debt founded upon that judgment, and provided for by the covenant of Archibald Gracie, deceased ; and that the executor having such prior dignity was entitled to retain the full amount of his debt. We are not, in my judgment, permitted to go behind that decree, (which is in itself sufficiently plain and intelligible) and in effect reverse it. The utmost extent to which we could in any event be permitted to go, if we intend that the character of permanency shall be attached to our decrees, is to re-examine the matter if any new state of facts is presented for our consideration which was unknown to the parties at the time when the former decree was made. That will be going sufficiently far, and probably too far; but even that cannot be insisted upon here ; for all the facts now before us were before this court when they made their previous decision *as reported. [ *355 ] It has been urged, it is true, that the proofs were not then put in, and such probably was the fact; but it cannot be said that the complainants —the present appellants—own statement of the case, as contained in their *270 bill of complaint, was not then before this court, exhibiting all the facts and documents upon which they now hope and urge this court in effect to reverse its previous judgment. The result of which reversal, in inducing upon the minds of the public the idea that this tribunal is in any degree vascillating in its decisions, will be highly prejudicial to the due and proper administration of justice. In truth, I cannot see any matter connected with our jurisprudence of greater moment,sand involving considerations of greater importance to the community at large, than to have it generally believed that this court of dernier resort is certain and fixed in the principles of its adjudications. '
That the decree of this court, as reported in 18 Wendell, did control and decide the very question as to the executor’s priority and right to retain, (which was in truth the question submitted to its consideration,) is apparent not only from the reading of the decree, but also from the manner in which his honor the chancellor has treated it, in speaking of it, in bis opinion upon making the order now appealed from.
As to a decree to be now made for an equal distribution of these funds among the appellants, the executor, and the other creditors, it is enough to say that the appellants do not now seek for any such thing ; they now ask this court to decide that under their judgment they are entitled to a priority over the executor and all the other creditors, and that upon such priority they are entitled to the payment in full of their claim, principal and interest, which the chancellor decided against, and from which decision they have appealed ; being adverse to the claim which they set up on the former hearing of this cause.
But even if the question is still to be regarded as open and undecided, it does appear to me to be one of easy solution ; and that the decree of the chancellor* if we adhere to the well settled law of the land, must be aErraed.
The agreement of assignment, release, and covenant, between [ *356 ] Archibald "Grade, Charles King, and William Grade, who were partners, and their trustees and creditors, made 27th April, 1824, (among whom were the present appellants, or those whom they represent, and the present defendant,) substituted a new contract between all the parties to it for the old judgments and other evidences of indebtedness, and became, as held by the chancellor in his opinion, what in the civil law is called a novation, which operates as an extinguishment of the old contract, and leaves the creditor to his remedy upon the new and substituted agreement. That this agreement must thus have operated to extinguish all the old contracts, judgments, or other evidences of debt, is evident upon every principle of law and equity applicable to such a case. First, it is apparent such was¡ the intent of the parties in making the agreement 'as manifested from the instrument itself, and the acts of the parties consequent upon it. And secondly, *271 such is the inference which the law draw's from such a state of facts as here exist. The agreement releases two of the members of the firm of Archibald Gracie & Sms, viz. Charles King and William Gracie. And that a release of one member discharges the others is decided in almost numberless cases; because the joint remedy being gone, the several one cannot exist; and in a joint contract, all the parties must be sued, which cannot be done, if some have been released. It was because these original debts were thus_ discharged that Archibald Gracie entered into a new contract to pay his creditors out of his French claims, when received, any balance which might remain due of their debts stated in the schedule to that agreement, and not of their judgments and other securities, as they existed before that agreement. And this covenant of Archibald Grade enured to the benefit of each individual creditor, and might be enforced by any of them individually. Thus it was, that all the creditors who became parties to that agreement released their original demands, whether secured by judgment or otherwise; and all became, so far as the dignity or priority of their several demands was concerned, placed upon the equal footing of specialty creditors, for the full amount of the balance of their debts, as stated by that new contract. And this having taken *place in 1824, and the testator, [ *357 ] Archibald Gracie, having died before the adoption of the Revised Statutes of 1830, when the executor was authorized by law to retain the amount of his demand in preference to all other creditors of an equal degree, the defendant, Nehemiah Rogers, is entitled not only by the former decree of this court, but also by the law, as long and well settled, to retain the amount of the balance due to him, stated in that agreement, in preference to the other creditors, no creditor having any legal priority over him; but the debts of all being of the same degree.
That the new agreement operated to discharge the original demands is further evident, from the fact, that if no such release had been given, those contracts upon the death of Archibald Gracie would have been extinguished at law, he having left partners, Charles King and William Gracie, surviving ; and the executor of Archibald Gracie could not at law be held liable upon those original demands, as they would only have’ survived against the surviving partners. The only remedy as against the executor would have been in equity, and then only in case of the insolvency of the surviving partners. Comyn on Cont. vol. 1, p. 327, ed. 1828 ; 6 Cowen, 441; 1 Wendell, 148. The release, as contained in the agreement, could not have the effect of continuing and keeping alive a liability, where none would have existed without it; and consequently the judgment creditors upon this view of the case would have no right of priority. If Archibald Gracie, by the discharge and release of his two partners, was also discharged at law, so also was his executor, though not in equity ; it is clear and indeed cannot be controver *272 ted, that the judgment of Hosack, which the appellants here represent, would not then be entitled to a priority.
It appears to me upon all the principles of law and equity appilcable to this case, that this court, and his honor the chancellor, have decided correctly. It is not the province of this court to make law. We have only to declare it as we find it established ; and therefore I am in favor of affirming the chancellor’s decree.
*By the President of the Senate.
This cause now comes before us for the first time upon its merits. Its consideration and decision may seem to be embarrassed by the decree entered in this court on the 26th of December, 1837 : see 18 Wend. 319. Indeed, this cause has been presented in this and the courts below in so great a variety of forms, and upon so many preliminary questions, that it becomes material, in considering the case now legitimately and finally before us on the merits, to ascertain what has been already decided, that we may thence see how far that, as res judicata, is binding on us as precedent.
On the 15th of June, 1836, the vice chneellor of the first circuit made an interlocutory order in this cause, directing N. Rogers, executor of A. Gracie, to bring the trust fund in question, with others, into court. From this order the executor appealed to the chancellor, who modified the order of the vice chancellor so far as to allow the executor to retain his probable pro rata dividend from the French fund, with his Commissions; and also the Commercial Insurance Company fund. Some other less important modifications were also made. From this order of the chancellor both parties appealed to this court. This constituted the case which was before this court and decided in 1837.
It will thus be perceived that the only question before the vice chancellor was merely as to the custody of the funds pendente lite. It is true, that the chancellor, in modifying this interlocutory order of the vice chancellor, had regard to the probable pro rata dividend of N. Rogers from the French fund. This, however, could not have been intended to be, nor could it have been conclusive as to amount even upon this point: because both those orders passed not only before the cause had been heard upon its merits; but even before the necessary proofs had been taken preparatory to such hearing. These orders, therefore, merely disposed temporarily of the custody of the funds until, upon the final hearing of the cause upon its merits, they should be distributed among the several parties interested therein, according to their respective rights, to be ascertained on such hearing. [ *359 ] The only question, then, in this cause, legitimately before *this court in 1837, was merely as to the custody of the funds pendente lite. It is true, that in considering this question, two of the members of the court did, by anticipation, discuss three other important questions, viz: *273 1st Whether the release of two of three partners and joint debtors discharged the other and extinguished the debt ? 2nd. Whether the separate covenant of Archibald Gracie in relation to the French fund, was an equitable mortgage or specific appropration of that fund ? and 3rd. Whether 1ST. Rogers, as executor of A. Gracie, could exercise the common law right of retaining," out of the French fund, as his own debt in preference to all others of the same class ? These were the main questions embraced in the original cause, and now to be decided, but which could only arise or properly be decided upon the merits. These questions the parties were still litigating and preparing for decision in the court below. They were not, and could not be, properly before this court in 1837: and although the second and third of them were embraced in the decree entered at that time, yet as they could not have been decided upon the merits, these not being then before the court the decree was merely interlocutory, and is binding upon the court, as precedent, only so far as it regarded the single true point properly before the court, viz : the custody of the funds until final decision. This is in conformity with a sound and well settled rule of law, repeatedly recognized in this court.
This cause now comes here upon its merits; and I shall proceed to consider the main questions it presents, unembarrassed by the decree pronounced in this court in 1837. In doing this, I might content myself with a simple concurrence in the very able opinion just given by his honor, the chief justice, in the conclusion of which, generally, I fully agree : but as I have taken somewhat different views of some of the points embraced in the case, I will present these briefly to the court. .
By the record it appears that on the 27th of April, 1824, the mercantile house of Archibald Gracie & Sons, consisting of Archibald Gracie, Wm. Gracie, and Charles King, entered into a composition deed with certain of their creditors, *whose names and debts were contained on a [ *360 ] schedule annexed to the deed. The deed is admitted to be drawn with great care and professional skill. It is to be presumed, therefore, that it fairly and fully expresses, and carries out the true intentions of the parties thereto.
The deed commences by a recital of the indebtedness of the parties of the first part, Archibald Gracie & Sons, and .of their inability to pay and satisfy the same; but declares a willingness “ to provide for the security and payment thereof, in the manner therein mentioned.” And for this purpose, it assigns, with power of attorney irrevocable, to trustees, for the benefit of the creditors named in the said schedule,, and who shall become parties to the said deed, the claim of the parties of the first part upon the British Government, and particularly specified in a schedule thereof, annexed to the deed. ‘ If the moneys arising from the assigned claim should be suffi *274 cient for that purpose, the debts of those creditors were to be fully paid : if insufficient, then reteably or proportionally.
That the parties to this deed supposed that the assigned claim on the British Government would be sufficient to fully pay the debts for which it is intended to provide, is evidenced by the covenant on the part of the trustees to pay over the surplus to Archibald Gracie individually.
The deed then proceeds to release and discharge the two junior partners, William Gracie and Charles King, from all debts or claims of the said creditors. Archibald Gracie then covenants and agrees that, if the moneys received from the British government upon the claim assigned, shall prove insufficient to pay the debts mentioned in the schedule annexed to the deed, “ that then, and in such case, such deficiency shall be made up and paid out of any moneys which shall or may he recovered and received by the said Archibald Gracie, his executors, administrators or assigns, of or from the French government, for or on account of certain large claims and demands which he, the said Archibald Gracie, now has on the said French government ; and that.such deficiency shall be paid out of said moneys [ *361 ] when, and as '‘soon as the same shall be received by the said Archibald Gracie, his executors, administrators or assigns.”
The main questions in this cause arise out of this instrument, and are to be determined by the interpretation to be given to it. It is a composition deed ; a general compounding of the debts for which it was intended to provide, substituting the provision therein made, for a full payment of them- by the original debtors. It was, as to the extent, .form and remedies, a novation of the original debts, raising some, reducing others, and placing all upon the same footing of equality. Under this deed, therefore, the question may well arise, whether, independent of the express release therein of the two junior partners, and its consequences, those creditors had any other remedy for their debts, or could claim any other payment of them than that provided in this deed. But without stopping here to discuss fully this question, I shall proceed to consider the effect of the release of the two junior partners.
As a general principle, it is an undoubted rule of law that a release of two of three joint debtors discharges the third also, and extinguishes the debt. But it is also conceded that in such a case the third joint debtor may continue to be liable for the joint debt, by his own consent. It is, however, admitted on all hands, that his continued liability or indebtedness must, in all such cases, depend upon, and be limited by his consent. Let us now apply these principles to the case in hand. ,■
The express release of the two junior partners, William Gracie and Charles King, would also have discharged Archibald Gracie, and extinguished the joint debts, if he had not expressly consénted, or by some act indicated a willingness to. remain liable for the same, to a certain extent, and un *275 der a new form. The original indebtedness, as in the case of a debtor discharged under an insolvent law, would constitute a valid consideration for the new engagement, and the obligation be thus continued by consent. Has Archibald Grade so consented; and, if so, in what manner, and to what extent ? The answer to this inquiry is found in his covenant 5m relation to the French fund. Let us see what that is. Is'it [e 262 ] that if, contrary to the just expectations of the parties, the moneys received from the British government upon the claim assigned, should prove to be insufficient to pay the debts in question, then the deficiency should be made up and paid out of the French fund, so soon as that should be received.
Does this amount to a consent to remain liable, generally, for those debts ? or is it not rather a covenant merely to receive and apply the French fund to their payment, so far as that would go ? Is not this the nature and extent of Archibald Grade’s obligation under this covenant ?
If this be so, is it not apparent, or very strongly to be inferred, that this was intended, by the parties, as a specific appropriation of the French fund to the payment of any deficiency which might remain upon the debts in question, after the receipt and application of the British claim ; and could not Archibald Grade, in his lifetime, have been, and ought not his executor now to be compelled so to apply that fund ? If so, does not this amount to an equitable mortgage of the fund, and give to these creditors an equitable lien upon it to the extent of their debts, in preference to the debts of any other creditors ? And will not this render the proceeds of the fund equitable assets in the hands of the executor, to be distributed according to the rule of equity, which is equality, and which is also the principle of the composition deed. This, at any rate, would be the case to the extent of the deficiency in the payment of the debts in question. If the fund should exceed that deficiency, such excess would undoubtedly become legal assets, and fall into the general estate of the testator, for the general purposes of that estate, and to be distributed in due course of administration.
Let us next consider the remaining important question, whether H. Rogers, in the exércise of a common law right, as executor of Archibald Gracie, can legally retain, out of the French fund in his hands, his own debt, in preference to all others of the same class ? The will of Archibald Gracie having taken effect previous to the revised statutes, this question is to be determined according to the law as it then stood. *This however can make no difference, under the view, which I [ *363 ] have taken of this question.
It will be admitted that the parties to the composition deed are bound by its terms. They can have, in relation to the funds disposed of therein, no rights inconsistent with that deed. The rights, as well as the obligations of *276 •the parties to that instrument, are clearly specified and established in and by the instrument itself. The principle of that deed was equity. If the view I have taken of it be correct, it gave to all the creditors who became parties to it, an equal participation in the two funds disposed of.in the deed, in proportion to their respective debts. It is certain, and will be conceded, that Archibald Gracie, after the execution of the deed, could not, by deed, have either altered its principle, or changed the rights or equities of the parties under it. Could he do by will, in this respect, what he could not do by deed f Can the former have a force which the latter could not ? This will not be pretended.
Equally impossible was it for N. Rogers by any act of his, either to alter the composition deed, or to vary the rights of any of the parties under it; much less to enlarge his own rights by a corresponding reduction of those of the other parties of the third part to that deed. But it may be said that this common law right of retainer, as executor, is cast upon N. Rogers, by operation of law. It may be answered, that N. Rogers, by voluntarily becoming a party to the composition deed, has thereby virtually covenanted that he will neither do, nor suffer any act or thing by which its principle would be altered, or the rights of the parties under it would be varied. Whatever might otherwise have been his common law right of retainer as executor, he can exercise none over the funds embraced in that deed, inconsistent with the deed itself. His being a party to the deed is a bar to any right inconsistent with its principle and terms. A contrary doctrine would be in the highest degree inequitable; and it cannot be doubted that its assertion and probable application in this case, disclosed at the time of the execution of the composition deed, would have effectually prevented its execution, and defeated the arrangement then entered into. This [ *364 ] *right of retainer in the executor is not one to be favored in any and certainly not in opposition to his own solemn and voluntary deed.
From the above, therefore, I come to the following conclusions:
1. That the release of William Gracie and Charles King was a discharge also of Archibald Gracie, and an extinguishment of the original joint debt, except so far as he censented and agreed to remain liable therefor,—which was only to the extent of the French fund.
2. That the individual covenant of Archibald Gracie in relation to the French fund, was an equitable mortgage or specific appropriation of that fund, which gave to the creditors executing the composition deed a lien thereon, in preference to all other creditors, and in proportion to their respective debts; and that the proceeds of the fund in the hands of the executor are consequently equitable assets, and are to be distributed according to the rule of equity, which is also the principle of the composition deed.
*277 3. N. Rogers cannot, in this case, exercise his common law right, as executor, of retaining out of the French fund his own debt in preference to all others of the same class ; for having become a party to the composition deed, he can only receive under it, his rateable proportion of the two funds embraced in that deed, according to his debt; and that, under the composition deed, his debt was limited to that amount.
The other parts of the decree of the court below I think correct.
I shall vote for a reversal of the decree, and for one in conformity with the views above expressed.
On the question being put, Shall this decree be reversed ? eight members of the court, viz: The President of Senate, The Chief Justice, Mr. Justice Cowen, and Senators Dixon, Hawkins, Hull, Nicholas and Root, answered in the Affirmative, and eleven members answered in the Negative. Whereupon the decree of the Chancellor was Aefirmed.